Filed 11/25/13  In re G.W. CA3

<u>**NOT TO BE PUBLISHED**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Yolo)

----

| | |
|---|---|
| In re G.W. et al., Persons Coming Under the Juvenile Court Law. | C072716 |
| YOLO COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES, | (Super. Ct. Nos. JV10-056, JV10-374) |
| Plaintiff and Respondent, | |
| v. | |
| B.W. et al., | |
| Defendants and Appellants. | |

James M. (father) and Brandy W. (mother) appeal from the juvenile court's orders terminating their parental rights as to minors G.W. and J.M.  (Welf. & Inst. Code, § 366.26.)[1]  Brandy W. is the biological mother of both minors; James M. is the biological father of J.M. and the stepfather of G.W.

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

Father contends the juvenile court erred by finding that the beneficial parental relationship exception to adoption did not apply as to J.M. (§ 366.26, subd. (c)(1)(B)(i).) Mother joins in father's arguments to the extent they benefit her. We shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In April 2010, the juvenile court sustained a section 300 petition filed by Yolo County Department of Employment and Social Services (the Department) as to three-year-old G.W. The petition alleged: Mother had significant mental health issues, suffered from substance abuse addiction, and lived with unsuitable companions. Mother had not complied with services offered to help her and G.W., who now suffered from global delays. G.W.'s father, B.W., had not protected or supervised her adequately, and had allegedly been extremely violent toward mother during their marriage.[2]

In May 2010, the juvenile court ordered G.W. placed in foster care and granted reunification services to mother, setting a six-month review hearing in November 2010.

Mother gave birth to J.M. in September 2010. J.M. was taken into protective custody because of allegations that mother and the alleged father, James M., had untreated substance abuse problems and mother was mentally unstable. At the detention hearing, the juvenile court determined that James M. was J.M.'s presumed father. Mother requested a psychological evaluation.

A psychological evaluation by Jayson Wilkenfield, Ph.D., advised against granting reunification services to mother, who suffered from a history of methamphetamine abuse, anxiety disorder, panic disorder, and bipolar personality disorder with paranoid traits. Dr. Wilkenfield opined that mother was emotionally unstable, at significant risk of

---

[2] At disposition, the juvenile court found that B.W. had mental health issues, lived in a group home for adults, and did not have a relationship with G.W. B.W.'s parental rights were terminated along with those of father and mother. He is not a party to this appeal. We refer to James M. as "father" with respect to both minors in this case.

relapse into substance abuse, and prone to periodic psychological breakdowns. Her chances of benefiting from services and regaining custody of the minors were remote.

At the jurisdictional hearing as to J.M. in October 2010, the juvenile court sustained the Department's section 300 petition, ordered a second psychological evaluation of mother, and set disposition in December 2010.

The Department's November 2010 status review report as to G.W. recommended terminating mother's services. Mother had not made significant progress in substance abuse treatment or mental health treatment. During visits, she still showed limited empathy and response to G.W. Although the minor remained developmentally delayed, she had made significant gains and had a good relationship with her foster family.

The second psychological evaluation of mother, done by Cynthia Neuman, Ph.D., in November 2010, found that mother suffered from posttraumatic stress disorder (PTSD) and might benefit from reunification services if correctly treated for that condition. Dr. Neuman thought mother's previous diagnoses were wrong and her treatments might actually have been damaging.

The Department's December 2010 disposition report as to J.M. recommended out-of-home placement, with reunification services for the parents. Mother and father had married. Father was working three jobs and was fully engaged in services. Mother had not made adequate progress in drug and mental health treatment, but in light of Dr. Neuman's opinion the Department could not recommend denying services to mother as to J.M.[3]

---

[3] The juvenile court may deny reunification services on grounds of mental disability only if two qualified experts agree that the disability would render the parent unable to benefit from services. (§ 361.5, subd. (b)(2); *Linda B. v. Superior Court* (2001) 92 Cal.App.4th 150, 152-153.) In a January 2011 addendum, the Department recommended reunification services for mother as to G.W.

In December 2010, at J.M.'s dispositional hearing, the juvenile court ordered him placed in foster care, granted reunification services to the parents, and set a six-month review hearing for June 2011. The court also set a January 2011 six-month review hearing as to G.W.

In January 2011, the juvenile court continued G.W.'s foster placement and granted further reunification services to mother.

In a 12-month review status report as to G.W. in March 2011, the Department recommended terminating mother's services. Mother had remained drug-free, but her participation and progress in mental health treatment were minimal. The minor enjoyed mother's visits, but was doing well in foster care and had formed a good relationship with her foster family. The minor continued to receive specialized educational services because of her speech delays.

In April 2011, at the contested 12-month review hearing as to G.W., the juvenile court granted further services to mother and calendared an early review of mother's progress.

In May 2011, the juvenile court ordered further services for mother as to G.W. and scheduled an 18-month review hearing for August 2011.

The Department's six-month review status report as to J.M., filed in May 2011, recommended terminating mother's and father's services and setting a section 366.26 hearing. J.M. was thriving in the foster home where he had lived since his birth. Mother had just begun to attend mental health services, and the quality of her visitation with the minor was poor; she did not seem able to improve her parenting skills in the near future. Father had done well in services and visitation, but his determination to remain with mother, even though he recognized her deficits as a parent, indicated that he was not willing to protect the minor.

4

In June 2011, at the six-month review hearing as to J.M., the juvenile court continued the parents' services, set a contested six-month review hearing and a trial-setting conference for an 18-month review hearing as to G.W. for late August 2011. The court also increased visitation.

On August 17, 2011, the juvenile court vacated the scheduled hearing dates and granted a 90-day continuance because both parents were making significant progress.

In December 2011, the Department's 18-month status review report as to G.W. recommended terminating mother's services and setting a section 366.26 hearing. Mother's court-appointed therapist thought mother had made progress, but felt constrained by professional ethics from evaluating mother's capacity to parent the minors. Dr. Neuman had agreed to update her evaluation, but could not do so before mid-January 2012. Mother's visitation and parenting were still poor in quality, and she frequently denigrated father in the minors' presence. Mother had recently taken Vicodin and had been untruthful about how she obtained it; father said mother took so many medications that he did not keep track of the details. Although mother had made significant progress in some respects, she had not demonstrated that she could complete the objectives of her treatment plan and provide for G.W.'s safety, protection, physical and emotional well-being and special needs even after 23 months since the minor's removal from her custody.[4]

The Department's 12-month status review report as to J.M., who was thriving in his foster home, recommended terminating both parents' services and setting a section 366.26 hearing. The report stated that father could probably parent J.M. on his own if not

---

[4] In an addendum report, the Department noted that mother's attendance at AA/NA (Alcoholics Anonymous/Narcotics Anonymous) meetings and other required meetings did not comply with her case plan because she attended most of them with father, contrary to the plan's directive.

for the time and dedication he gave to caring for mother, whose chronic illness and pain took up a great deal of his focus. He was not employed and had no source of income other than the maternal great-grandmother. He was "co-dependent" with mother, sacrificing his needs to take care of hers. Although he had positive and loving interactions with both minors, he had remained in an unhealthy relationship and had not addressed the dysfunctional aspect of the relationship in services.

Dr. Neuman's followup report, dated January 20, 2012, stated that in the limited time allowed under law for further services, mother could not benefit from them sufficiently to be a safe parent for the minors. Despite outward progress, her "chaotic internal psychological structure," deformed by a lifetime of abuse and violence, had not changed.

A February 2012 addendum report indicated that mother had missed 17 percent of the available visits between late November 2011 and early February 2012, and father had missed 22 percent. Although there were incidents of odd behavior by both parents, the visits generally went well.

In February and March 2012, the juvenile court held a consolidated contested hearing (a 12-month hearing as to J.M. and an 18-month hearing as to G.W.) that took up three court days. After hearing voluminous testimony from the parents, Dr. Neuman, the case-carrying social worker, and the visitation supervisor, among others, the court ordered the termination of the parents' services as to both minors and set a section 366.26 hearing on August 7, 2012. The court relied mainly on Dr. Neuman's opinion that further services could not enable mother to become a safe and effective parent.[5] The court did not agree with the Department that father was unable to care for himself and complete his

_____

[5] The court acknowledged that Dr. Neuman did not evaluate father, but it "extrapolate[d]" from Dr. Neuman's report and testimony that further services would also not make father a safe and effective parent.

case plan, or that mother's anxiety and PTSD in themselves constituted grounds for not returning the minors to her custody.

Father filed a timely writ petition in this court challenging the termination of services. We summarily denied the petition on May 31, 2012. (*Joyce G. v. Superior Court* (1995) 38 Cal.App.4th 1501, 1513-1514.)

In April 2012, father was arrested for inflicting corporal injury on mother and making terrorist threats. Mother told the police she and father had argued about his recent drug use. The trial court issued her a protective order.

Adoption assessments filed by the state Department of Social Services in July 2012 recommended adoption for both minors. G.W. had been in her current placement since February 2010; J.M. had been in his current placement since September 2010. Both sets of caretakers wanted to adopt.

G.W., now five years old, was meeting developmental milestones and no longer needed special educational services. However, her mental and emotional status was "compromised": She threw tantrums, lied, and acted self-destructively. She was not receiving mental health services, but would be referred for counseling.

G.W. enjoyed living with her caretakers, had developed a close relationship with them, and looked to them for support and reassurance. She would benefit from the permanency of adoption.

G.W. and J.M. saw each other once a month during visits with mother. The two sets of foster parents maintained contact and had agreed to continue to do so after adoption. The minors' sibling relationship would not suffer as a result of adoption.

G.W. had tantrums after mother's visits. G.W.'s caretakers did not think continued contact with mother would be in G.W.'s best interest, due to mother's history of substance abuse and mental illness.

7

J.M., now 21 months old, was meeting developmental milestones, had a mental and emotional status appropriate to his age, and appeared to be adjusting well to his caretakers. He sought them out for affection and reassurance.

After mother's visits, J.M. was "very clingy" toward his caretakers. Father was not currently visiting J.M. because he had recently been incarcerated.

J.M.'s current caretakers appeared suitable as an adoptive family. They did not wish to maintain continued contact with mother due to her history, and so long as father was incarcerated there would be no further contact with him.

The Department's section 366.26 reports, which largely relied on the adoption assessments, recommended terminating parental rights and choosing a permanent plan of adoption for the minors.

In addition to what was in the adoption assessments, the Department noted:

G.W. was in special education in preschool and still had speech delays, but she would be in a regular class in kindergarten and would continue speech and language therapy.

Mother and father visited on a court-ordered schedule that progressively reduced their visits, most recently to one per week; J.M. also attended the visits. Mother used the visits to try to find out where G.W. and the foster parents lived. The foster parents were concerned that mother might be trying to stalk them and G.W.

J.M. appeared to enjoy visiting with father, but did not go willingly to mother and appeared indifferent to her, often pushing her away. J.M. became aggressive in day care after visits. The foster mother reported that father had missed the last several weeks of visits.

It was likely that both minors would be adopted if parental rights were terminated.

In August 2012, psychologist Donald Siggins, Ed.D., conducted a "[p]arental and [s]ibling [b]onding [a]ssessment" on behalf of father. Based on a review of documents in the case, observation of two supervised visits, and interviews of the parents, Dr. Siggins opined that the minors were attached to both parents, although J.M. was more attached to father than to mother. (J.M. was generally closer to men than to women.) The parents were very affectionate during visits, and the minors responded in kind (except that J.M. was reluctant to respond when mother tried to "coax an affectionate response").

The parents insisted they had done everything the juvenile court ordered and had successfully rehabilitated themselves.

The fact that G.W. bonded easily with her foster family after being removed from mother's custody at age two showed that she had acquired a "secured bonding structure" during "the attachment period while in her mother's care." The parents' visitation had reinforced G.W.'s attachments to mother, father, and J.M. "[G.W.] is securely bonded, attached, and reciprocally connected to all of her caregivers, but she also recognizes that even though her parents can only care for [a] short time at a special place, she knows that [father] and [mother] are her real parents." Therefore, "completely severing the bonds between [G.W.] and her natural mother and stepfather would more than likely generate a[n] emotional detriment to the child characterized by internalization, a traumatic sense of loss, and increased depression."

J.M., placed in foster care soon after birth, "experienced the crucial bonding period of infancy with his foster parents. Like his sister before, however, he quickly transferred the bonding obtained to other caregivers, i.e., to his natural parents, [father] and [mother]." Moreover, J.M. was "busy bonding, attaching and building a lifelong relationship with his older sister, [G.W.]" If these ties were severed, he would probably forget he had a sister. The loss of the sibling relationship would "generate a detriment in both children." To sever parental ties "may teach the child that 'relationships do not

9

workout [*sic*],' that 'reaching out and exploring simply is not worth the effort.' To the degree the child internalizes these negative lessons, he will move towards withdrawing into a schizoid reaction. It is opined, therefore, that completely severing the bonds between the child and his natural parents at this time will more than likely generate schizoid reaction and a detriment to the child."

A November 2012 addendum gave updated information on the parents' visitation and other events in their lives. Visitation records showed that mother attended eight out of a possible 11 visits from August through November, but father attended only three. From the time reunification services ceased in April 2012, mother missed eight visits and father missed 12.

On October 30, 2012, mother informed the visitation supervisor that she confronted father about a methamphetamine pipe in the spare bedroom, and a fight ensued, resulting in her breaking her shoulder. She admitted using methamphetamine on October 26, 2012, and being on painkillers; a drug test was positive for opiates. Father had once attended a visit while under the influence of methamphetamine; mother knew of his condition but did not try to exclude him from the visit.

On November 5, 2012, management at the parents' residence stated that the parents had " 'skipped.' " The next day, mother, who had moved to a new apartment, claimed that father had come home high on methamphetamine and she had told him to check himself into rehab. Father had reported two relapses.

On November 7, 2012, the visitation supervisor was informed that father had moved in with mother at the new apartment.

On November 14, 2012, mother admitted a recent relapse on methamphetamine. She did not know whether father was off drugs. Father did not confirm or deny a relapse, but said he and mother were " 'moving forward' " and trying to stay together.

10

The juvenile court held a contested section 366.26 hearing as to both minors beginning on November 19, 2012. The witnesses included case-carrying social worker Christa Humes, visitation supervisor Heather Sleuter, Dr. Siggins, Dr. Neuman, and mother.

Humes, who had been assigned to the case since May 2012, testified that there might be good reasons for the parents to miss any particular visit, but did not amend the numbers given in the Department's reports as to how many visits had been missed. J.M. had a hard time separating from his foster parents and going to visits; when he did go, he went more readily to father than to mother. The parents sometimes argued in front of the minors during visits.

Sleuter, who had supervised visitation in the case for two years, testified that when visits started it took both minors about 10 minutes to engage with the parents, and it was not hard to separate the minors from the parents when visits ended. The parents' attendance at visits was not consistent; father had not visited since September 26, 2012, and mother's visitation was irregular. When they did visit, Sleuter sometimes had to redirect their behavior and to remind them to wash their hands, and they sometimes smelled strongly of cigarettes. Mother said both parents had relapsed on methamphetamine as of October 26, 2012. J.M. favored father more than mother, but father more often played inappropriately with the minors. On one visit when he was under the influence of marijuana, he roughhoused and frightened the minors.

Dr. Siggins, who was qualified by the juvenile court as an expert on attachment, testified that he observed interactions between the parents and the minors twice for an hour at a time and studied four months of visitation records before writing his report in August 2012. He based his opinion that the termination of father's parental rights would cause detriment to J.M. (in the form of internalizing "feelings of inadequacy" and developing a "schizoid reaction") on "learning theory," "child development," and the

11

"process of registration." Father had a parental relationship with J.M., the loss of which would be traumatic for J.M.[6] Although G.W., whose attachment to mother was greater than her attachment to father, would suffer less than J.M. from the termination of father's parental rights, she would be "confused" and "depressed" and would experience "traumatic loss." The benefit to the minors from continuing their relationship with the parents would be that this traumatic loss would not happen. Dr. Siggins believed, however, that one parental visit per month could avoid triggering such trauma, and even after the termination of parental rights the trauma could be mitigated by continuing contact with the parents on a diminishing scale of visits. Caring foster parents and therapy could also mitigate such trauma.

Dr. Neuman disagreed with Dr. Siggins's bonding assessment and his estimate of the detriment to the minors from terminating mother's and father's parental rights. G.W. was not securely attached to mother, who suffered from PTSD and methamphetamine addiction during the first two years of G.W.'s life; if a child has a "disorganized attachment" to a biological parent, but a secure bond with foster parents, it is in the child's best interest and causes no lasting damage to sever the attachment to the biological parent. Father's bond with G.W. was merely that of a "friendly adult" who saw her only one to three hours a week and did not provide primary parental care. J.M. had formed a secure attachment to his lifelong caretakers, and children with such attachments do not suffer a "schizoid reaction" to the termination of biological parents' parental rights. The total loss of contact between minors and their biological parents

---

[6] Dr. Siggins acknowledged that J.M.'s bond to his foster parents was greater than his bond to mother and father and that he identified the foster parents as his parents. But Dr. Siggins insisted that J.M. was "transferring" his bond with the foster parents to mother and father—it was being "transferred slowly . . . with each contact." Under the juvenile court's questioning, he explained that such a bond can be shared between foster parents and natural parents.

12

might be traumatic, but the severing of the parental relationship in itself was not necessarily so. In any event, the minors' stability with their foster parents outweighed any possible benefit of maintaining the parental relationships here.

Mother testified that the parents' visits with the minors went well, and they were happy and affectionate with both parents (although J.M. spent most of the time with father). Mother admitted one relapse with methamphetamine in April 2012, but none since. Mother knew that father was not currently using methamphetamine; he had used marijuana in April.

The juvenile court ruled that the minors were adoptable and the beneficial parental relationship exception to adoption did not apply. Father had not regularly visited the minors, although mother had. There was no compelling reason that the minors would benefit from maintaining the parental relationship, and any detriment from severing the relationship could be mitigated by a graduated reduction in visits and by therapy. It was in the minors' best interest to establish permanence through adoption. Therefore, the court ordered the termination of mother's and father's parental rights.

## DISCUSSION

Father contends in his opening brief that the juvenile court erred by finding the beneficial parental relationship exception did not apply as to J.M. (Thus, any claim as to G.W. is forfeited.) In his reply brief, he contends—for the first time on appeal, and without showing the contention was raised below—that the court should have adopted a permanent plan of guardianship. Mother joins in and adopts all of father's arguments to the extent they benefit her, and asserts that if the order terminating father's parental rights is reversed, the order terminating her parental rights must also be reversed.

We conclude the juvenile court correctly found the beneficial parental relationship exception inapplicable and correctly ordered adoption as the permanent plan.

13

" 'At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must make one of four possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368 (*Ronell A.*).)

Under certain limited circumstances, the court may find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One of these is the beneficial parental relationship exception, under which the parent has the burden of showing that he or she has maintained regular visitation and contact with the child, and the child would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i); *In re C.F.* (2011) 193 Cal.App.4th 549, 553 (*C.F.*).) The benefit to the child must promote the child's "well-being . . . to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*); accord, *C.F., supra*, 193 Cal.App.4th at p. 555.) Even frequent and loving contact is not sufficient to establish this benefit, absent a significant, positive, emotional attachment between parent and child. (*C.F., supra*, 193 Cal.App.4th at p. 555; *Autumn H., supra*, 27 Cal.App.4th at p. 575.)

"Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that

14

preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*).)

As the parent must establish the existence of the factual predicate of the claimed exception, and the juvenile court must then weigh the evidence and determine whether it constitutes a compelling reason for determining detriment, substantial evidence must support the factual predicate of the exception, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re K.P.* (2012) 203 Cal.App.4th 614, 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.) "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) " '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge.' " (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351.)

To establish the beneficial parental relationship exception, father had to show first that he had maintained regular visitation and contact with the minors. It was undisputed that father missed many scheduled visits from April 2012 through November 2012, the time of the section 366.26 hearing. Accordingly, the juvenile court found that father had not established this prong of the exception. Substantial evidence supports this finding.

Father asserts to the contrary that he "had maintained regular and consistent visitation with his son *prior to the referral order*" (italics added) and that the social worker noted father had missed recent visits "due to illness or job demands." These arguments fail. The statutory test for regular visitation and contact is not restricted on its face to any sub-period within the overall dependency proceedings, and father cites no

15

authority holding that visitation and contact for a restricted time is enough to satisfy the test. And whether or not father had a facially plausible reason to miss any particular visit, the fact remains that he missed many, and he does not show by record citation that he ever asked the social worker or the visitation supervisor for the chance to make up any visit he missed.

Because father's showing fails at the first prong of the exception, we could stop the analysis there. But since the juvenile court also found substantial evidence that father had not satisfied the second prong, we will address that prong as well.

When a minor is adoptable, the juvenile court must order adoption unless the parent shows a compelling reason to find that the detriment from severing parental ties would outweigh the benefit to the minor from stability and permanence. All that father offered on this point was the opinion of Dr. Siggins. But Dr. Siggins rested that opinion on the unconvincing premise (apparently derived only from a mechanical application of general theories about attachment) that J.M., a child under two years old who had lived since birth with his prospective adoptive parents and had formed a strong secure attachment to them, would inevitably suffer a "schizoid reaction" if his ties to a parent he had never lived with, and who had not been a regular part of his life for a long time, were cut. Dr. Neuman opined to the contrary—that a child of this age with a strong secure bond to his foster parents would suffer no such reaction. The juvenile court was within its discretion to place more weight on Dr. Neuman's opinion, which comports with common sense and ordinary experience, than on that of Dr. Siggins. And even Dr. Siggins admitted that any trauma from the cutting of parental ties could be mitigated by a graduated reduction in visits, the presence of caring foster parents, and therapy (if needed).

Substantial evidence supports the juvenile court's finding that father did not satisfy the second prong of the beneficial parental relationship exception test.

16

Assuming father's belatedly raised contention that the court should have adopted a permanent plan of guardianship is properly before us, we note only that if a child is adoptable and a parent fails to establish that any exception to adoption applies, the court must terminate parental rights and choose adoption as the permanent plan. (*Ronell A.*, *supra*, 44 Cal.App.4th at p. 1368.) Such is the case here.

Since father's arguments have failed, we find that none of them would inure to mother's benefit. And since we are not reversing the order terminating father's parental rights, we also do not reverse the order terminating mother's parental rights.

## DISPOSITION

The orders terminating parental rights are affirmed.


                                                  BUTZ          , J.


We concur:


     ROBIE         , Acting P. J.


     MAURO        , J.